# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Tiffany M. Lightle,

      Plaintiff,

  v.

Officer Matthew Olson, Officer Katie Winckler,
City of Maple Grove, Katie Jean Allen, and
Brokea, Inc., d/b/a Pearle Vision Maple Grove,

      Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 16-12 ADM/TNL

_____

Jordan S. Kushner, Esq., Law Office of Jordan S. Kushner, Minneapolis, MN, on behalf of
Plaintiff.

Ryan M. Zipf, Esq., League of Minnesota Cities, St. Paul, MN, on behalf of Defendants Officer
Matthew Olson, Officer Katie Winckler, and City of Maple Grove; Kyle S. Willems, Esq.,
Tewksbury & Kerfeld, P.A., Minneapolis, MN, on behalf of Defendants Katie Jean Allen and
Brokea, Inc., d/b/a/ Pearle Vision Maple Grove.

_____

## I. INTRODUCTION

On March 9, 2017, the undersigned United States District Judge heard oral argument on
Motions for Summary Judgment of Defendants Katie Jean Allen and Brokea, Inc., d/b/a Pearle
Vision Maple Grove's ("Pearle Vision"), and Defendants Officer Matthew Olson, Officer Katie
Winckler, and City of Maple Grove ("Maple Grove") [Docket Nos. 17, 27]. For the reasons set
forth below, the Motions are granted.

## II. BACKGROUND

### A. Events at the Store

On December 21, 2014, Plaintiff Tiffany M. Lightle ("Lightle"), an African American,
went with her son and mother to Pearle Vision in Maple Grove, Minnesota, to pick up

replacement eyeglasses. Compl. [Docket No. 1-1] ¶ 8. While her son was being fitted for his new glasses, Lightle and her mother were "killing time." Zipf Aff. [Docket No. 31] Ex. 1 ("Lightle Dep.") at 19:4. They browsed the store's inventory trying on frames displayed throughout the store. Id. 18:17–19:25. The store was fairly busy; other customers were also browsing inventory, and Pearle Vision employees were restocking frames into display cases. Zipf Aff. Ex. 9 at 8–9.

While they looked at glasses, Lightle alleges that a Pearle Vision employee gave her and her mother "dirty looks." Lightle Dep. at 76:25–77:6. Lightle further alleges that this employee watched and followed them around the store. Id. 75:5–6. Lightle eventually discussed a pair of purple frames with a different employee and also spoke with other employees about sports and the weather. Id. 22:12–19; 71:11–25. Although Lightle was interested in the purple frames, she decided against them after learning that they would need to be refitted and placed on order, and that she would have to be re-examined due to insurance rules. Id. 71:20–25; 72:14–20; 74:3–17; 77:21–78:5. Once her son's glasses fitting was completed, Lightle spoke with an employee about when she could later return for an eye exam, and then Lightle, her son and mother left the store without incident. Id. 77:21–78:5; 79:10–16; 99:18–100:1.

After Lightle left, three employees approached store manager Katie Jean Allen ("Allen") to relay their suspicions that Lightle had stolen a pair of Tiffany & Co. ("Tiffany") brand sunglasses. Carter Aff. [Docket No. 22] ¶ 3; Segura Aff. [Docket No. 24] ¶ 3. The employees relayed their observations that Lightle and her mother were suspiciously shuffling sunglasses back and forth in a section of the store where a pair of Tiffany sunglasses was found to be missing from the sunglasses display board. Carter Aff. ¶ 3; Segura Aff. ¶ 3.

It is Pearle Vision's policy that the eyewear racks are always fully stocked. Hawley Aff. [Docket No. 23] ¶ 4. If a pair of glasses is sold, employees are specifically trained to immediately re-fill the now empty slot with new eyewear. Id. ¶¶ 4, 5. This policy is primarily for inventory control purposes, as it helps the store immediately determine if a theft has occurred. Id. ¶¶ 5, 6. Two of the employees who spoke with Allen recalled seeing an empty slot of Tiffany sunglasses in the display nearby where Lightle and her mother had been standing, and one specifically remembered that the display was completely full before Lightle and her mother approached the display. Carter Aff. ¶ 3; Segura Aff. ¶ 3. Pearle Vision reports all thefts to law enforcement if they have sufficient proof. Zipf Aff. Ex. 4 ("Allen Dep.") at 99:18–100:1.[1]

Based upon the reports of her employees, Allen made the decision to contact the Maple Grove Police Department to report a possible theft. Id. 75:17–19.

## B. Police Investigation at the Store

Maple Grove Patrol Officer Katie Winckler ("Officer Winckler") was dispatched to Pearle Vision in response to Allen's call. Zipf Aff. Ex. 3 ("Winckler Dep.") at 17:13–16. Upon arriving at the store, Allen reported to Officer Winckler that two women had been suspiciously passing sunglasses back and forth and that after they left, a pair of Tiffany sunglasses valued at $450 was missing from the display case where the women had been standing. Id. 17:18–18:1; 22:23–25; 33:14–16; 37:25–38:4. Lightle was identified as one of the women through a Medica ID card she had used at the store. Id. 17:18–20. Officer Winckler asked Allen if she could view the store's surveillance video, but it was unavailable. Id. 22:2–13. According to Allen, it can

_____

[1] For the deposition transcripts with the page number in the left margin, the page number begins the deposition page.

take up to an hour-and-a-half to obtain the recorded video for a specific timeframe.  Allen Dep.

at 37:20–22.

At Officer Winckler's direction, Allen completed and signed a citizen's arrest form,

which included a statement explaining the incident:

> At around 3:30 Sunday the 21st two women came in with a young boy to pick up
> MA glasses.  The two women went to the eye glass display and passed frames back
> and forth.  Their behavior gave the indication that they may be stealing.  When they
> left the store 1 frame from our sun board was missing.  I then called the police to
> report possible theft.

Winckler Dep. at 21:15–21; Ex. 1 at 10.  Based upon the information she received from Allen,

Officer Winckler decided to arrest Lightle for theft.  Id. 24:19–25:11.

Officer Winckler contacted Maple Grove Officer Matthew Olson ("Officer Olson") to

provide him the information Allen gave about the alleged theft.  Id. 24:21–24; Zipf Aff. Ex. 5

("Olson Dep.") at 15:16–18; 16:2–6.  In addition to relaying what Allen had stated, Officer

Winckler told Officer Olson that she had enough information to arrest Lightle for theft.

Winckler Dep. at 26:2–4.  Officer Olson ran Lightle's license plate and identified a home address

in Crystal, Minnesota.  Olson Dep. at 18:1–10.  Officer Olson next requested that a Crystal

police officer check the address for Lightle's vehicle.  Id. 18:14–19.  Crystal Officer Jonathan

Wilkes ("Officer Wilkes") responded.  Zipf Aff. Ex. 7 ("Wilkes Dep.") at 11:11–15.

## C.  Events at the Crystal Residence

Officer Wilkes drove to the Crystal address and spoke with Lightle.  Id. 13:8–12.

Officer Wilkes told Lightle why he was there and requested that she wait in the back of his squad

car.  Lightle Dep. at 25:5–17; Wilkes Dep. at 13:8–2.  Lightle complied.

During her time in the back of Officer Wilkes' squad car, Lightle was not handcuffed and

was permitted to use her cell phone. Lightle Dep. at 34:12–16. Lightle testified that she called Pearle Vision to see if there was some misunderstanding, but the conversation was abruptly terminated. Id. 25:19–26:1; 27:11–20. Shortly thereafter, Lightle claims Officer Wilkes handed her his phone with Officer Olson on the other end. Id. 27:20–22. According to Lightle, Officer Olson said that the surveillance video shows her stealing a pair of glasses. Id. 27:22–24. Lightle challenged that assertion because the Pearle Vision employee she spoke with by phone told her that the surveillance video was unavailable. Id. 27:24–28:2. Lightle asserts that Officer Olson then called her a liar and a thief, which was overheard by the father of her children, who was standing nearby. Id. 28:9; 43:23–44:7.

Officer Wilkes does not recall allowing Lightle to use his phone to speak with Officer Olson. Wilkes Dep. at 14:20–15:1. Officer Olson denies speaking with Lightle on the telephone. Olson Dep. at 21:21–23. Lightle was in Officer Wilkes' squad car for 20 minutes before Officer Olson arrived.

Upon arriving at the house, Officer Olson first spoke with Officer Wilkes and Lightle's mother before questioning Lightle about the missing glasses. Id. 24:10–17. Lightle admitted to recently being at Pearle Vision, but denied stealing a pair of glasses. Id. 25:7–13. Lightle answered all of Officer Olson's questions while continuing to deny stealing the glasses. Id. 30:23–31:4.

Based on the totality of the circumstances, including the information he received from Officer Winckler, Officer Olson determined that he had sufficient information to charge Lightle

with theft.  Id. 31:9–19.  Lightle was not taken into custody, but was rather issued a tab charge[2] to appear at a later court date.  Id. 33:10–14.  Olson's interaction with Lightle lasted approximately 30 minutes.  Id. 30:16–22.

## D.  Officer Olson Returns to the Store

The next day, Officer Olson returned to Pearle Vision to secure a copy of the surveillance video.  Id. 33:17–18.  Officer Olson believed the video shows Lightle concealing a pair of glasses in her winter jacket prior to exiting the store.  Id. 34:23–35:5; Olson Aff. [Docket No. 30] ¶¶ 2, 3.

Sometime thereafter, Officer Olson completed a police report.  Winckler Dep. at Ex. 1 at 4–6.  The report includes what Allen reported to Officer Winckler, Officer Olson's interaction with Lightle at the Crystal house, Officer Olson's belief that the surveillance video shows Lightle stealing a pair of glasses, and the issuance of a tab charge for Lightle to appear at a later court date.  Id.

The theft charges against Lightle were eventually dropped.  Olson Dep. at 35:19–36:1.  The glasses were never recovered.

## E.  The Lawsuit

Approximately a year after the incident, Lightle filed this lawsuit in state court.  The Complaint alleges violations of 42 U.S.C. §§ 1981 and 1983, violations of the Minnesota Human Rights Act, and false imprisonment, defamation, malicious prosecution, and negligence.

---

[2] The Minnesota Rules of Criminal Procedure define a tab charge as "a charging document filed by an officer at a place of detention, or an amendment of the charges on the record by the prosecutor, that includes a reference to the statute, rule, regulation, ordinance, or other provision of law the defendant is alleged to have violated."  Minn. R. Crim. P. 1.04(c).

Lightle's claims arise from her contention that she was arrested because of her race and without probable cause. Defendants removed the case to federal court under 28 U.S.C. § 1331, and now move for summary judgment on all claims.

## III. DISCUSSION

### A. Summary Judgment Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). However, the nonmoving party may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. Cty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

If evidence sufficient to permit a reasonable jury to return a verdict in favor of the nonmoving party has been presented, summary judgment is inappropriate. Id. However, "the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment. . . . Instead, 'the dispute must be outcome determinative under prevailing law.'" Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992) (citation omitted). "[S]ummary judgment need not be denied merely to satisfy a litigant's speculative hope of finding some evidence that might tend to support a complaint." Krenik, 47 F.3d at 959.

### B. Federal Law Claims

#### 1. Section 1983

Lightle asserts that all Defendants are liable under 42 U.S.C. § 1983 for violations of the

Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Lightle's Complaint further contends that the Defendants conspired among themselves to violate her constitutionally protected rights.

### a. Allen and Pearle Vision did not Engage in Sufficient Joint Activity to be Liable Under § 1983

The parties agree that Allen and Pearle Vision, as private actors, can be liable under § 1983 only if they engaged in joint activity with the police. Allen and Pearle Vision argue that merely contacting the police and reporting a possible theft does not create sufficient joint activity to sustain a § 1983 claim. Lightle responds that Allen reporting unsubstantiated allegations of theft to Officer Winckler and requesting that Lightle be arrested is sufficient to establish that Allen engaged in joint activity with the police. Lightle further argues that because the police did not conduct an independent investigation of the alleged theft and instead relied exclusively upon Allen's statement, Pearle Vision can be considered to be acting jointly with the police.

Section 1983 liability only extends to state actors. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 150 (1970). However, a private party "who willfully participates in joint activity with the State or its agents is considered a state actor." Youngblood v. Hy-Vee Food Stores, Inc., 266 F.3d 851, 855 (8th Cir. 2001) (citing Adickes, 398 U.S. at 152). Joint activity requires "a conspiracy, an agreement on a joint course of action in which the private party and the state have a common goal." Gramenos v. Jewel Cos., Inc., 797 F.2d 432, 435 (7th Cir. 1986) (citing Adickes, 398 U.S. at 152); Mershon v. Beasley, 994 F.2d 449, 451–52 (8th Cir. 1993).

### i. Allen

Lightle's claim against Allen does not survive summary judgment because the record lacks any evidence for a reasonable juror to conclude that there was an actual agreement between

Allen and the state actor. Instead, the record shows that Allen contacted the police after receiving reports from employees she supervised claiming that Lightle had stolen a pair of sunglasses. When Officer Winckler arrived to investigate, Allen relayed to Officer Winckler what her employees had seen.[3] Mere invocation of state authority, standing alone, is insufficient as a matter of law to demonstrate joint activity. See Young v. Harrison, 284 F.3d 863, 870 (8th Cir. 2002) (holding that a security guard did not act jointly with the state by calling the police); Magee v. Trs. of Hamline Univ., Minn., 747 F.3d 532, 537 (8th Cir. 2014) (noting that joint activity requires "facts that the two entities acted in concert"); Miller v. Compton, 122 F.3d 1094, 1098 (8th Cir. 1997) (finding no § 1983 liability "for merely answering a law enforcement official's questions"). Accordingly, all of Lightle's § 1983 claims against Allen must be dismissed.

## ii. Pearle Vision

The Eighth Circuit has explained that "[a] store may be considered to be acting jointly with police when the police detain accused shoplifters without making an independent investigation or pursuant to a customary plan between the store and the police department." Youngblood, 266 F.3d at 855. An example of a customary plan between a store and the police department is found in Murray v. Wal-Mart, Inc., 874 F.2d 555 (8th Cir. 1989). In that case, a private store was found to have acted in concert with the police when: 1) it had an established practice of working with police to prosecute shoplifters; 2) the store's security guard was an

---

[3] Lightle argues that Allen erroneously told Officer Winckler that she personally observed Lightle's behavior instead of stating that her employees reported to her what they saw. Because the joint activity inquiry here turns on an agreement between Allen and the state actor, this discrepancy is irrelevant.

employee of the police department and had a close relationship with the prosecuting attorney, and; 3) the decision to prosecute was based upon the security guard's word rather than an independent investigation of the facts.  Id. at 558–59.  None of those circumstances are present here.

Rather, this case is factually similar to Youngblood, which held that there was insufficient joint activity to find a private store liable under § 1983.  In Youngblood, a store employee believed Youngblood had stolen beef jerky.  266 F.3d at 853.  The employee stopped Youngblood as he was leaving the store and discovered that the container of jerky Youngblood had purchased was crammed full of jerky that the employee assumed Youngblood had taken from a different container.  Id. at 853.  The employee then detained Youngblood for approximately 20 minutes while the police were being summoned.  Id. at 853–54.  An officer arrived and arrested Youngblood based upon the employee's statement and the officer's observation of the very full jerky container.  Id. at 854.  In distinguishing Murray, the Youngblood court noted that the store employee was not employed by the police, and the responding officer investigated the incident by speaking with the employee and inspecting the jerky container of allegedly stolen merchandise.  Id. at 855.

Unlike Murray, there is no evidence here that Pearle Vision had a customary plan of working with law enforcement.  Like Youngblood, Officer Winckler performed an independent investigation.  When she arrived at the store, she learned from Allen that Lightle was observed acting suspiciously near a display board where a pair of sunglasses was later missing.  Officer Winckler asked Allen questions about what she observed, and had her attest to her observations on a citizen's arrest form.  Officer Winckler's investigation was sufficiently independent to

negate any claim of joint activity between Pearle Vision and the police. Therefore, all of Lightle's § 1983 claims against Pearle Vision are dismissed.

> ### b. Officers Winckler and Olson are Entitled to Summary Judgment on Lightle's § 1983 Claims

> #### i. Unlawful Seizure, Detention, and Malicious Prosecution in Violation of the Fourth Amendment[4]

Officers Winckler and Olson argue that qualified immunity insulates them from liability for Lightle's Fourth Amendment claims for unlawful seizure, detention, and malicious prosecution.[5] Lightle disagrees, arguing that qualified immunity does not apply here because she was arrested without probable cause. Since a warrantless arrest in the absence of probable cause violates a clearly established constitutional right, the application of qualified immunity turns on whether probable cause existed at the time Lightle was arrested.

Qualified immunity protects governmental officers "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause, and an officer is entitled to qualified immunity if there is at least 'arguable probable cause.'" Ulrich v. Pope Cty., 715 F.3d

---

[4] The Complaint also alleges a Fourth Amendment violation premised on an unlawful search. Because Lightle admits that she consented to Officer Olson searching her vehicle, this claim has been abandoned. See Mem. Opp'n [Docket No. 35] at 13 ("[Lightle] asked [Officer] Olson to search her vehicle for the glasses.").

[5] The parties dispute whether Lightle's claim for malicious prosecution should be analyzed under a Fourth Amendment framework or under the more general substantive due process. Since qualified immunity applies under either framework, elaboration on this issue is unnecessary.

1054, 1059 (8th Cir. 2013) (quotations omitted). "An officer has probable cause to make a warrantless arrest when the totality of the circumstances at the time of the arrest 'are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.'" Borgman v. Kedley, 646 F.3d 518, 523 (8th Cir. 2011) (quoting Fisher v. Wal-Mart Stores, Inc., 619 F.3d 811, 816 (8th Cir. 2010)). "Though the probable-cause standard allows room for reasonable mistakes by a reasonable person, the qualified-immunity standard protect[s] all but the plainly incompetent or those who knowingly violate the law." Greenman v. Jessen, 787 F.3d 882, 888 (8th Cir. 2015) (citations and quotation marks omitted).

Although law enforcement officials are given "substantial latitude in interpreting and drawing inferences from factual circumstances," that discretion is constrained by two factors. United States v. Washington, 109 F.3d 459, 465 (8th Cir. 1997). First, the "totality of the circumstances" means that an officer is not free to ignore evidence that negates the possibility that a suspect has committed a crime. Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999). Law enforcement officers must also "conduct a reasonably thorough investigation prior to arresting a suspect, at least in the absence of exigent circumstances." Id. "An officer need not conduct a 'mini-trial' before making an arrest, but probable cause does not exist when a 'minimal further investigation' would have exonerated the suspect." Id. (citations omitted); see also Joseph v. Allen, 712 F.3d 1222, 1228 (8th Cir. 2013) ("The law does not require law enforcement officers to conduct a perfect investigation to avoid suit for false arrest.").

Lightle faults Officer Winckler's investigation into the alleged theft for exclusively relying upon Allen's recitation of what she was told by her employees in deciding there was probable cause to arrest. Lightle contends that Officer Winckler should have interviewed other

store employees, verified the missing merchandise through an inventory or bar code number, and viewed the surveillance footage prior to deciding to arrest Lightle. The Court disagrees.

When Officer Winckler arrived at Pearle Vision, she spoke with Allen, the store manager, who stated that two women were acting suspiciously around a display of sunglasses, and that a pair of sunglasses was missing immediately after the women left. Since Allen reported observing some of these events first hand, it was reasonable for Officer Winckler to conclude that she did not need to interview other employees because she already had received the relevant information from Allen.[6] See Peterson v. City of Plymouth, 60 F.3d 469, 474–75 (8th Cir. 1995) ("[O]fficers are generally entitled to rely on the veracity of information supplied by the victim of a crime."). It was also reasonable for Officer Winckler to conclude that she had probable cause to arrest Lightle without knowing the serial number of the missing merchandise. Allen had identified the glasses as tortoise shell color Tiffany brand sunglasses with a gold Tiffany emblem on the side, and connecting the missing glasses with a serial number was not something Allen would have readily been able to do. Winckler Dep. at Ex. 1 at 7; Allen Dep. 35:7–25. Additionally, arresting Lightle without first viewing the surveillance video was reasonable under the circumstances. Although some time had already passed, acting quickly upon the information generally enhances possible recovery of the merchandise. Allen told

---

[6] Lightle repeatedly argues that Officer Winckler should have interviewed the employees who actually witnessed Lightle's allegedly suspicious behavior rather than relying exclusively upon what Allen said. But the record is clear that Allen conveyed to Officer Winckler that Lightle and her mother were passing glasses back and forth over a display board that Allen personally observed was missing a pair of glasses after Lightle exited the store. Allen Dep. at 17:18–18:20. Since a probable cause determination "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest," Officer Winckler's conclusion that she did not need to interview other potential witnesses was reasonable. New v. Denver, 787 F.3d 895, 910 (8th Cir. 2015) (citation omitted).

Officer Winckler that the video would not be ready for at least 30 minutes.[7]  Officer Winckler's

decision not to wait for the video but to proceed was a reasonable exercise of an officer's

investigatory discretion.  See Clayborn v. Struebing, 734 F.3d 807, 809–10 (8th Cir. 2013)

(concluding that arguable probable cause existed, even where there was more the officers could

have done to investigate, including "viewing video surveillance footage").  Finally, in

conducting her investigation into the alleged theft, Officer Winckler did not ignore exculpatory

witnesses or close her eyes to any facts that tended to exonerate Lightle.  See Kuehl, 173 F.3d at

651 (holding that an officer was not entitled to qualified immunity when the officer ignored

exculpatory evidence and refused to interview key witness).

Under the circumstances, Officer Winckler's investigation of the theft was "reasonably

thorough."  Id. at 650.  Obtaining arguable probable cause does not first require exhaustion of all

investigatory options, and courts are ill-suited to evaluate whether specific leads warrant further

investigation.  Clayborn, 734 F.3d 809–10; Flowers v. City of Minneapolis, Minn., 558 F.3d

794, 798 (8th Cir. 2009).  Lightle seeks to require Officer Winckler to investigate "all potential

sources of exculpatory evidence," but "[t]hat is not the correct test."  Stepnes v. Ritschel, 663

F.3d 952, 961 (8th Cir. 2011).  Considering the circumstances and the evidence known to Officer

Winckler at the time, arguable probable cause existed for Lightle's arrest for theft.

Officer Olson is also entitled to qualified immunity.  Officer Olson learned from Officer

Winckler that Lightle was observed acting suspiciously near a display of sunglasses and that a

pair of Tiffany brand sunglasses was missing from that display case after Lightle left the store.

---

[7] Allen testified that Pearle Vision began efforts to obtain surveillance video right after
Officer Winckler left the store.  Allen Dep. at 38:1–9.

When Officer Olson arrived to speak with Lightle, she admitted to being at Pearle Vision and to being around the sunglasses display, confirming the report Officer Olson received from Officer Winckler and providing the basis for arresting Lightle consistent with Officer Winckler's direction. See Doran v. Eckold, 409 F.3d 958, 965 (8th Cir. 2005) ("[L]aw enforcement officers may rely on information provided by others in the law enforcement community, so long as the reliance is reasonable."). Officer Olson did not discover any evidence from Lightle that would have undermined the reasonableness of his reliance upon Officer Winckler's report.[8]

### ii. Equal Protection Under the Fourteenth Amendment

Lightle argues that Officers Winckler and Olson's arrest of her was motivated by her race and her receipt of public assistance. The Officers respond that neither Lightle's race nor her public assistance status played any part in their decision to arrest her for theft.

"The Equal Protection Clause generally requires the government to treat similarly situated people alike." Klinger v. Dep't of Corrs., 31 F.3d 727, 731 (8th Cir. 1994). To succeed on this claim, Lightle must prove that Officers Winckler and Olson "intentionally treated [her] differently from others similarly situated and that there is no rational basis for the difference in treatment." Gallagher v. Magner, 619 F.3d 823, 839 (8th Cir. 2010) (quoting Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam)).

Lightle's claim that she was treated differently because she was receiving public assistance lacks support in the record. The only indication that Lightle was receiving public assistance is in Allen's citizen's arrest form, where she wrote that "two women came in with a

---

[8] Lightle claims that her denial of wrongdoing should have instigated further investigation by Officer Olson. Lightle's denial is not the type of "plainly exculpatory evidence" officers are not permitted to ignore. Kuehl, 173 F.3d at 650.

young boy to pick up MA glasses." Winckler Dep. at Ex. 1 at 10. Even assuming Officer Winckler knew that "MA" referred to Medical Assistance, there is nothing in the record to support Lightle's conclusion that she was treated differently because she received public assistance.[9]

There is also insufficient evidence for a reasonable juror to conclude that Lightle's race motivated the Officers to treat her differently. To establish a violation of the Equal Protection Clause, Lightle must show that she was treated differently than other persons who were "in all relevant respects similarly situated." Bills v. Dahm, 32 F.3d 333, 335 (8th Cir. 1994). In this case, Lightle has offered no evidence that Officers Winckler or Olson investigate alleged crimes committed by non-African Americans differently than what occurred here.[10] Lightle's Equal Protection claim rests upon pure speculation, which is insufficient to survive summary judgment. Because there is no evidence that Officer Winckler or Olson's conduct deviated from what is customary, Lightle's equal protection claim fails.

### iii. Conspiracy

Lightle also asserts a § 1983 conspiracy claim against Officers Winckler and Olson.[11]

---

[9] This contention is further impaired because Olson did not include any reference to "MA" or public assistance when he completed his incident report. See Winckler Dep. at Ex. 1 at 4 (noting that "[t]wo women came in with a young boy to pick up glasses"). Since Allen's statement detailed in Officer Olson's incident report was relayed through Officer Winckler, Officer Olson's report's omission of "MA glasses" suggests that either Officer Winckler did not relay the "MA glasses" information to Officer Olson, or that Officer Olson deemed the statement irrelevant.

[10] There is no evidence that Officers Winckler or Olson made any statements of racial animus.

[11] Having concluded that Allen and Pearle Vision lacked the requisite joint action to be held liable under § 1983, the analysis here will focus only on Officers Winckler and Olson.

She argues that there is evidence of an inferred agreement between Defendants to have her arrested without probable cause.

"To prove a 42 U.S.C. § 1983 conspiracy claim, a plaintiff must show:  (1) that the defendant conspired with others to deprive [her] of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff."  White v. McKinley, 519 F.3d 806, 814 (8th Cir. 2008).

Lightle's conspiracy claim fails because she cannot demonstrate the first element, which requires "evidence of specific facts that show a 'meeting of minds' among conspirators."  Barstad v. Murray Cty., 420 F.3d 880, 887 (8th Cir. 2005).  The record is completely absent of any evidence, circumstantial or overt, purporting to show an agreement between any Defendant to deprive Lightle of a constitutional right or privilege.  Lightle's conspiracy claim under § 1983 must be dismissed.

### iv.  Due Process

Lightle asserted a due process claim arising under the Fifth and Fourteenth Amendments against all Defendants.  Since Lightle did not oppose Officers Winckler and Olson's summary judgment arguments on this claim, it has been abandoned.  See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs., 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument.").

### c.  The City of Maple Grove is entitled to Summary Judgment on Lightle's §1983 Claims

Lightle also seeks to hold Maple Grove liable under § 1983.  Lightle argues that the evidence supports a conclusion that Maple Grove had a practice of failing to train its police officers on the constitutional requirements of probable cause.  That failure, Lightle contends, was

a municipal custom or policy that caused the deprivation of her rights.

Under Monell v. Dept. of Social Services of City of New York, 436 U.S. 658 (1978), "a municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue."  City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989) (emphasis in original).  Because a municipality's liability does not attach under a theory of respondeat superior, municipal liability only results "if an action or policy itself violated federal law, or if the action or policy was lawful on its face but led an employee to violate a plaintiff's rights [and] was taken with 'deliberate indifference' as to its known or obvious consequences." Pietrafeso v. Lawrence Cty., S.D., 452 F.3d 978, 982 (8th Cir. 2006) (quotations and citation omitted).  For Lightle's failure to train argument to succeed, she must point to evidence that Maple Grove's training practices were inadequate, that Maple Grove was deliberately indifferent to the rights of others in adopting them such that the failure to train "reflects a deliberate or conscious choice" by Maple Grove, and that Lightle's injury was caused by the alleged deficiency in Maple Grove's training procedures.  Parrish v. Ball, 594 F.3d 993, 997 (8th Cir. 2010) (quotations and citation omitted).

Lightle argues that Officer Winckler's testimony highlights Maple Grove's failure to train its officers on the contours of probable cause and arrest.  According to Lightle, Officer Winckler testified that she had no specific training on probable cause, that it was departmental practice to automatically charge shoplifting cases based upon a signed citizen's arrest form, and that only reasonable suspicion was needed prior to arrest.  Mem. Opp'n at 28.  But Officer Winckler did not testify as Lightle alleges.  Rather, Officer Winckler stated that she did have training on probable cause, and that a citizen's arrest form is part of the probable cause

determination rather than conclusive of probable cause. Winckler Dep. 64:18–23; 66:15–67:3. And although Officer Winckler initially testified that she only needed reasonable suspicion prior to arrest, she later clarified her testimony to state that probable cause is indeed required before arresting an individual. Second Zipf Aff. [Docket No. 44] Ex. 10. Officer Olson testified that Maple Grove's field training program trained him in determining whether probable cause exists to support an arrest. The testimony of the Officers contravenes any claim that Maple Grove's training policies were inadequate. Finally, as concluded above, since at least arguable probable cause supported Lightle's arrest, she cannot show that she was injured because of any defective policy of Maple Grove. Therefore, Maple Grove is entitled to summary judgment on Lightle's § 1983 claims.

### 2. Section 1981

Lightle asserts a 42 U.S.C. § 1981 claim against all Defendants. This claim is based upon two events. The first concerns the "dirty looks" Lightle received from a Pearle Vision employee while browsing inventory, and the second focuses on her future re-exam appointment.

Section 1981 provides that all persons within the United States shall have "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). This claim has four elements: "(1) membership in a protected class, (2) discriminatory intent on the part of the defendant, (3) engagement in a protected activity, and (4) interference with that activity by the defendant." Gregory v. Dillard's, Inc., 565 F.3d 464, 469 (8th Cir. 2009). To satisfy the third element, Lightle must demonstrate the she "'actively sought to enter into a contract with the retailer,' and made a 'tangible attempt to contract.'" Id. at 470 (quoting Green v. Dillard's, Inc., 483 F.3d 533, 538 (8th Cir. 2007)). "In view of the statute's focus on

protecting a contractual relationship, a shopper advancing a claim under § 1981 must show an attempt to purchase, involving a specific intent to purchase an item, and a step toward completing that purchase." Id. The fourth element requires a retailer to "thwart" or block "the creation of a contractual relationship." Id. at 471.

There is no evidence that shows Lightle was thwarted or blocked from purchasing a specific item. Browsing inventory is not protected activity for § 1981 purposes because is falls short of "actively [seeking] to enter into a contract with the retailer." Id. at 470.[12] Lightle's other claim, that her future re-exam appointment is sufficient evidence of a contractual relationship, also does not state a § 1981 claim. Lightle argues that she had a continuing contractual relationship in the form of a future appointment to be fitted for a pair of purple glasses. This argument fails because the record does not reflect that she actually had an appointment. Rather, Lightle testified that she asked an employee when her insurance would be able to cover an eye exam for her to get the purple glasses fitted. When the employee told her the exam would be covered on January 27, 2015, Lightle responded that she will "be back in." Lightle Dep. at 78:2–5. Lightle's plan of returning at a later date is too speculative to support a § 1981 claim, as "[a] claim for interference with the right to make and enforce a contract must allege the actual loss of a contract interest, not merely the possible loss of future contract opportunities." Morris v. Office Max, Inc., 89 F.3d 411, 414–15 (7th Cir. 1996). Lightle's §

---

[12] Even if Lightle's browsing somehow does satisfy the third element, there is no evidence that she was blocked or thwarted from making a purchase. To the extent that Lightle argues an employee's dirty looks dissuaded her from buying something, even if those looks were the result of racial profiling, "[r]acially biased watchfulness, however reprehensible, does not 'block' a shopper's attempt to contract." Withers v. Dick's Sporting Goods, Inc., 636 F.3d 958, 965 (8th Cir. 2011) (quoting Gregory, 565 F.3d at 472).

1981 claim therefore fails.

## C. State Law Claims

Lightle argues that Defendants violated the Minnesota Human Rights Act ("MHRA") and committed torts of defamation, malicious prosecution and negligence. Lightle also asserts a claim of false imprisonment against Officer Olson. Defendants argue that each of these claims is ripe for summary judgment because they either fail on the merits or are barred by immunity or privilege.

### 1. Officers Winckler and Olson are Entitled to Official Immunity on Lightle's Minnesota Human Rights Act, False Imprisonment, Malicious Prosecution, and Negligence Claims

Officers Winckler and Olson argue that official immunity protects them from liability on these state law claims. "Under the doctrine of official immunity, 'a public official charged by law with duties which call for the exercise of his [or her] judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong.'" Vassallo ex rel. Brown v. Majeski, 842 N.W.2d 456, 462 (Minn. 2014) (quoting Anderson v. Anoka Hennepin Indep. Sch. Dist. 11, 678 N.W.2d 651, 655 (Minn. 2004)). Under Minnesota law, official immunity turns on: "(1) the conduct at issue; (2) whether the conduct is discretionary or ministerial and, if ministerial, whether any ministerial duties were violated; and (3) if discretionary, whether the conduct was willful or malicious." Id. Here, the conduct at issue is Officers Winckler and Olson's investigation of the alleged theft, and the resulting probable cause determination that resulted in Lightle's arrest for theft. Thus, the first task is determining whether the Officer's conduct was discretionary or ministerial.

Evaluating whether conduct is discretionary or ministerial requires focusing on the nature

of the act.  <u>Mumm v. Mornson</u>, 708 N.W.2d 475, 490 (Minn. 2006).  A discretionary duty is one that involves "individual professional judgment that necessarily reflects the professional goal and factors of a situation."  <u>Id.</u> at 490–91 (quoting <u>Weiderholt v. City of Minneapolis</u>, 581 N.W.2d 312, 315 (Minn. 1998)).  By contrast, "a ministerial duty is one in which nothing is left to discretion; it is 'absolute, certain, and imperative, involving merely execution of a specific duty arising from fixed and designated facts.'"  <u>Wiederholt</u>, 581 N.W.2d at 315–16 (quoting <u>Cook v. Trovatten</u>, 274 N.W. 165, 167 (Minn. 1937)).

Here, Officer Winckler's initial probable cause determination and Officer Olson's later reliance upon that conclusion are discretionary.  Officer Winckler exercised discretion in her investigation of the alleged theft, an act that clearly did not "involv[e] merely execution of a specific duty arising from fixed and designated facts."  <u>Id.</u> at 315–16.   Officer Winckler exercised further discretion when she concluded that the totality of the circumstances generated probable cause to arrest Lightle for theft.  Olson's reliance upon Officer Winckler's report of probable cause was similarly discretionary in nature.

Because Officers Winckler and Olson's conduct was discretionary, Lightle must show the conduct was willful or malicious.  Lightle has failed to put forth any evidence which would tend to show that Officers Winckler or Olson acted willfully or with malice during the investigation and the subsequent arrest.  Accordingly, Officers Winckler and Olson are entitled to official immunity on Lightle's MHRA, false imprisonment, malicious prosecution, and negligence claims.

**2. Maple Grove is Entitled to Vicarious Official Immunity on Lightle's Minnesota Human Rights Act, False Imprisonment, Malicious Prosecution, and Negligence Claims**

"When applicable, vicarious official immunity protects the government entity from suit based on the official immunity of its employee." Id. at 316. Because Officer Winckler and Olson are entitled to official immunity on Lightle's MHRA, false imprisonment, malicious prosecution, and negligence claims, Maple Grove is also immunized from suit.

**3. Officer Olson and Allen are Entitled to Qualified Privilege on Lightle's Defamation Claim**

Lightle brings a defamation claim against Officer Olson based on his allegedly calling her a liar and a thief during their interaction at Lightle's residence.[13] Lightle also alleges a defamation claim against Allen for incorrectly claiming to have personally observed her engage in suspicious behavior.

**a. Officer Olson**

Officer Olson argues that absolute privilege insulates him from liability for his statements. Absolute privilege covers "statements made by many categories of public officials, and [has] the purpose of making officials as free as possible from fear that their actions in [their] position[s] might subject them to lawsuits for defamation." Zutz v. Nelson, 788 N.W.2d 58, 62 (Minn. 2010) (quotations omitted). Absolute privilege has been extended to statements officers make in their reports, but not "to all statements made by peace officers." Minke v. City of

_____

[13] The Complaint also alleges defamation against Officer Winckler, but Lightle's opposition memorandum only references a defamation claim against Officer Olson and Allen.

Minneapolis, 845 N.W.2d 179, 183 (Minn. 2014).[14]  Although absolute privilege does not apply to Officer Olson's statements to Lightle, qualified privilege does.  "A statement is protected by qualified privilege if it was 'made in good faith and . . . upon a proper occasion, from a proper motive, and . . . upon reasonable or probable cause.'"  Krogh v. Sweeney, 195 F. Supp. 3d 1049 (D. Minn. 2016) (quoting Bol v. Cole, 561 N.W.2d 143, 149 (Minn. 1997)).

Officer Olson arrived at Lightle's residence having been told that there was probable cause to arrest her for theft.  Thus, Officer Olson's comments were made in good faith, upon a proper occasion, from a proper motive, and upon reasonable or probable cause.  And although "[a] qualified privilege is abused and therefore lost if the plaintiff demonstrates that the defendant acted with actual malice[,]" Lightle has not demonstrated actual malice.  Lewis v. Equitable Life Assurance Soc'y of the U.S., 389 N.W.2d 876, 890 (Minn. 1986).  For Lightle to demonstrate actual malice, she must show that the statements were "made . . . from ill will and improper motives, or causelessly and wantonly for the purpose of injuring [her]."  Bahr v. Boise Cascade Corp., 766 N.W.2d 910, 920 (Minn. 2009) (quotations omitted).  No such evidence is in the record.

### b. Allen

Allen is similarly entitled to qualified privilege for statements she made to Officer Winckler and included in her citizen's arrest form.  Qualified privilege may be extended to certain types of communications for public policy reasons.  Lewis, 389 N.W.2d at 889.  "A qualified privilege for good-faith reports of suspected criminal activity made to the police would

---

[14] To the extent that Lightle is alleging a defamation claim based on statements in any police report, those statements are protected by absolute privilege.  Carradine v. State, 511 N.W.2d 733, 736-77 (Minn. 1994).

serve the public interest, despite the risk that some reports might be defamatory." <u>Smits v. Wal-Mart Stores, Inc.</u>, 525 N.W.2d 554, 557 (Minn. Ct. App. 1994).

Here, Allen's statement to Officer Winckler that she personally observed Lightle acting suspiciously was a good-faith effort to report a theft based on the statements provided to her by her employees. The affidavits of two of the employees who witnessed Lightle first hand provide the same material information that Allen told Officer Winckler; specifically, that Lightle and her mother were suspiciously passing glasses near a display case that was found to be missing a pair of Tiffany sunglasses once the women left. Allen was merely conveying to Officer Winckler what her employees saw. There is nothing in the record to suggest that Allen's statements were made from "ill will and improper motives, or causelessly and wantonly for the purpose of injuring [Lightle]." <u>Bahr</u>, 766 N.W.2d at 920. Allen did not defame Lightle.

### 4. Allen and Pearle Vision are Entitled to Summary Judgment on Lightle's Public Accommodation Discrimination Claim, and Allen is Entitled to Summary Judgment on Lightle's Aiding and Abetting Discrimination Claim

#### a. Public Accommodation Discrimination

The MHRA makes it unlawful to "deny any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation because of race, color, creed, religion, disability, national origin, marital status, sexual orientation, or sex." Minn. Stat. § 363A.11, subd. 1. Pearle Vision satisfies the MHRA's definition of a "place of public accommodation." Minn. Stat. § 363A.03, subd. 34. Public accommodation claims are analyzed using the <u>McDonnell Douglas</u>[15] burden-shifting framework, which requires Lightle to first establish a prima facie case of discrimination. <u>Monson v.</u>

---

[15] <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

Rochester Athletic Club, 759 N.W.2d 60, 63 (Minn. Ct. App. 2009). To do so, Lightle must show that (1) she is a member of a protected class, (2) she was denied services or accommodations by Pearle Vision, and (3) the denial occurred because of her membership in the protected class. Id.

Lightle has failed to adduce the minimal evidence needed to demonstrate that the denial of any services or accommodations were motivated by her race. See Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1119 (8th Cir. 2006) (noting that a plaintiff's evidentiary burden at the prima facie stage is minimal), abrogated on other grounds by Torgerson v. City of Rochester, 643 F.3d 1031 (8th Cir. 2011). The only evidence in the record of arguable discriminatory motive is an unidentified store employee who gave Lightle, the only non-Caucasian customer in the store at the time, "dirty looks" and followed her around the store. Lightle Dep. 76:25–77:6; Lightle Decl. [Docket No. 36] ¶ 6. Lightle has not, however, uncovered evidence that Pearle Vision has a history of discriminating against racial minorities, or that it has not adopted policies addressing discrimination in the workplace.

In other cases addressing evidence of disparate treatment, racially charged comments such as "I know how you Black guys from Chicago are," or calling someone an "angry black man," failed to provide prima facie evidence that race was behind the allegedly disparate treatment. Phillips v. Speedway SuperAmerica LLC, No. 09-2447, 2010 WL 4323069, at *1, *3 (D. Minn. Oct. 22, 2010); Porter v. Children's Health-Care Minneapolis, No. C5–98,1342, 1999 WL 71470, at *5–6 (Minn. Ct. App. Fed. 16, 1999); see also Hervey v. Cty. of Koochiching, 527 F.3d 711, 720 (8th Cir. 2008) ("[A] single comment that merely references [race] is not sufficient to create a genuine issue of material fact of [race] discrimination."). Here, "dirty

looks" are even weaker evidence of racial animus than a racially charged comment.  Thus, Pearle Vision is entitled to summary judgment on Lightle's MHRA public accommodation claim.

### b.  Aiding and Abetting Discrimination

Lightle's aiding and abetting discrimination claim requires a viable underlying MHRA discrimination claim.  Since there is no viable discrimination claim, Allen cannot be liable under an aiding and abetting theory.

### 5.  Allen and Pearle Vision are Entitled to Summary Judgment on Lightle's Negligence Claim

Lightle argues that Defendants failed to exercise a reasonable standard of care in causing her arrest and subsequent theft charge.  To sustain a negligence action, Lightle must show a duty of care, breach of that duty, causation, and damages.  Bjerke v. Johnson, 742 N.W.2d 660, 664 (Minn. 2007).

Lightle's negligence claim is entirely premised on broad conclusory statements lacking legal or evidentiary support.  Lightle has not presented any evidence that Allen or Pearle Vision breached a duty of care that she was owed.  Additionally, because Lightle's other claims fail on the merits, Lightle cannot show that she was damaged by any act of either Allen or Pearle Vision.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendants Katie Jean Allen and Brokea, Inc., d/b/a Pearle Vision Maple Grove's Motion for Summary Judgment [Docket No. 17] is **GRANTED**, and Defendants Officer Matthew Olson, Officer Katie Winckler, and City of Maple Grove's Motion for Summary Judgment [Docket No. 27] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  June 5, 2017.